# United States District Court
EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| V. | § | CASE NO. 4:12-cr-166 |
| | § | Judge Crone |
| BRENDAN W. COUGHLIN (1) | § | |
| HENRY D. HARRISON (2) | § | |
| W. MARK MILLER (3) | § | |

## REPORT AND RECOMMENDATION
## OF UNITED STATES MAGISTRATE JUDGE

Pending before the Court is the Joint Motion to Dismiss the Superseding Indictment for Failure to Allege Mailings in Furtherance (Dkt. #60).

### BACKGROUND

Between September 2006 and February 1, 2009, Defendants Brendan Coughlin ("Coughlin") and Henry Harrison ("Harrison") were two of the four principals of Provident Royalties, LLP ("Provident"), an entity that solicited investments for oil and gas projects in the United States. (Superseding Indictment ¶¶ 1-3). Defendant Mark Miller ("Miller") served as the Chief Financial Officer and, later, as President of Provident. (*Id.* ¶ 4). During the course of their business activities, Coughlin, Harrison, Miller, and others allegedly made false material representations and omissions of material facts to investors in order to solicit their investments. (*Id.* ¶¶ 9, 10). It is alleged that Coughlin, Harrison, and others failed to disclose the role of a third principal, Joseph Blimline ("Blimline"), in order to conceal that Blimline had violated Michigan securities laws, (*Id.* ¶ 10(b)), and used proceeds from later investors to pay dividends to earlier investors (*Id.* ¶ 10(d)).

Defendants were charged in count one of the superseding indictment with conspiracy to commit mail fraud in violation of 18 U.S.C. §§ 1349 and 1341. Coughlin and Harrison are also

charged in counts two through eleven with violations of 18 U.S.C. §§ 1341 and 2.

The superseding indictment charges all three defendants with conspiracy to commit mail fraud and with ten counts of mail fraud. Specifically the superseding indictment charges the defendants with having

> devised and intended to devise a scheme and artifice . . . to defraud the Provident investors and to obtain money from the Provident investors by making materially false and fraudulent pretenses, representations, and promises . . . and in executing and attempting to execute the scheme and artifice to defraud, sent or caused to be sent confirmation letters and subscription agreements by United States Mail...

(Superseding Indictment ¶ 15).[1]

On January 14, 2013, Defendants filed their joint motion to dismiss (Dkt. #60). On January 16, 2013, the Government filed a response (Dkt. #62). On January 23, 2013, Defendants filed a reply (Dkt. #66).

Defendants assert that the charged mailings of confirmation letters and subscription agreements were not mailings in furtherance of the alleged scheme "to obtain money from Provident investors." Defendants argue that the alleged mailings, consisting of cover letters confirming receipt of investor money and executed copies of the subscription agreements, did not materially aid the consummation of the charged scheme and occurred after the object of the alleged scheme had been achieved.

To obtain a conviction under the mail fraud statute, 18 U.S.C. § 1341, the Government must prove: "(1) a scheme to defraud; (2) use of the mails to execute that scheme; and (3) the specific intent to defraud." *United States v. Strong*, 371 F.3d 225, 227 (5th Cir. 2004) (quoting *United States v. Bieganowski*, 313 F.3d 264, 275 (5th Cir. 2002). In order for a mailing to be a part of the

---

[1] This charge only applies to Defendants Coughlin and Harrison.

execution of a fraudulent scheme, it need not be an essential part of the scheme, but may be "incident to an essential part of the scheme or a step in the plot." *Id.* at 229 (quoting *Schmuck v. United States*, 489 U.S. 705, 710-11 (1989)). However, as the Fifth Circuit has recognized, the Supreme Court's holding in *Schmuck* that a mailing need only be incidental to an essential part of the scheme is "cabined by the materiality of the mailing, as well as its timing: A tangential mailing occurring after the success of a fraud scheme is complete would never qualify, even if the mailing is 'incidental' to a part of the scheme." *Id.* To be material, a mailing must either advance the fraud or have been integral to it. *Id.* at 230. A "lulling communication" is a mailing sent after the victim's money has been obtained that is designed to "lull the victim[] into a false sense of security, postpone [his] ultimate complaint to authorities, and therefore make the apprehension of the defendants less likely." *United States v. Lane*, 474 U.S. 438, 451-52 (1986). For a "lulling" letter to constitute part of a scheme to defraud, it must have some effect on the success or failure of the fraudulent scheme. *United States v. Toney*, 598 F.2d 1349, 1353 (5th Cir. 1979) (citation omitted).

Defendants assert that in this case the charged mailings are not in furtherance of a scheme to defraud. Defendants argue that each of the charged mailings occurred after the investor money had been received. Since the charged mailings occurred after the object of the alleged scheme had been obtained, they could only be in execution of the alleged scheme if they constituted "lulling" communications.

Defendants assert that each charged mailing in this case consists of two documents. The first is a cover letter acknowledging receipt of funds from the investor, accepting the subscription agreement, and listing the documents enclosed along with the letter. The second document in each of the charged mailings is one of the enclosures listed in the letter – a copy of the executed

3

subscription agreement previously submitted by that investor to Provident Asset Management ("PAM"), with an added notation acknowledging receipt of the investor's funds. Defendants argue the following: that neither the cover letters nor the subscription agreements are alleged to have had any "lulling" effect on investors; neither document was mailed as part of a plan to neutralize concerns of the investors regarding the legitimacy of company operations; neither document set forth assurances to investors in the face of problems with the investment entities; and is it not alleged that in the absence of the mailing, the alleged scheme would have been detected. Defendants assert that both the cover letters and the subscription agreements contained acknowledgments of funds already received.

Defendants further assert that the charged mailings simply returned to each investor the subscription agreement he or she had already executed and submitted to PAM, with an added notation accepting the agreement and acknowledging receipt of funds. They reason that it would have made no difference at all to the success of the alleged scheme if the charged mailings had never been sent. The money had already been received from each investor and each investor had already reviewed and executed the subscription agreement. Defendants cite the Court to *Henderson v. United States*, 425 F.2d 134 (5th Cir. 1970) to support their theory.

In response, the Government concedes that the Defendants' description of the mailings in their background section is correct: The mailings alleged in the superseding indictment are confirmations and executed subscription agreements that were sent from Provident to the investors. However, the Government asserts that Defendants are incorrect in that the transmission of the money from the investor to Provident did not – according to the Private Placement Memoranda ("PPMs") – complete the scheme to defraud. The Government asserts that per the terms of each of the PPMs,

4

an executed subscription agreement and payment of funds did not constitute an investment in Provident, but rather an offer to invest. The investment did not actually occur until Provident confirmed acceptance of the subscription agreement, which it did by the very letter listed in the superseding indictment.

The Government points to the Court that the following language typically used in each PPM is as follows:

How to Subscribe
> An eligible investor may subscribe for Preferred Stock by properly completing, executing, and delivering the following to the Managing Dealer:
> (a) The fully executed Purchaser Suitability Questionnaire included as an exhibit to this Memorandum; and
> (b) An executed subscription agreement in the form attached to this Memorandum; and
> (c) Payment in an amount equal to the subscription amount of the Preferred Stock to be purchased payable to the order of "Shale Royalties 14, Inc."

. . . .
> The execution of the subscription agreement by an investor constitutes a binding offer to buy the securities subscribed for and an agreement to hold the offer open until the subscription agreement is accepted or rejected by the Corporation.

(Excerpt from Shale 14 PPM, attached to as Ex. 1, at 16 (Dkt. #62)). The PPMs inform the investor that "a copy of your subscription agreement, as accepted by the Corporation, will be returned to you to show your ownership of the Preferred Stock."

The Government argues that the PPMs underscore that Provident has the right to reject any subscription agreement for any reason. "The Corporation has the discretion to refuse to accept any subscription agreement without liability to the investor." (Dkt. #62, Ex. 1 at 16.) The PPMs also state that Provident will evaluate the investors' Suitability Questionnaire and subscription agreement before determining whether to accept a particular investor: "Persons from whom subscriptions will be accepted by the Corporation will be determined on the basis of information provided by, and

representations made by, each prospective purchaser." (Dkt. #62, Ex. 1 at 17.). The Government argues that the same or substantially the same language was used in each of the PPMs upon which the mail fraud counts are predicated.

In their reply, Defendants assert that the Government does not dispute the fact that every single mailing in the superseding indictment was sent after the money that the Government has alleged was the object of the scheme had already been obtained. Defendants argue that the charged mailings occurred after the money that is alleged to have been the object of the scheme was received, and now the Government seeks to amend its allegations that the transmission of the money did not complete the scheme to defraud.

The Court rejects Defendants' arguments and agrees with the Government. The executed subscription agreements, and the payments that the investors made to Provident, did not finalize the scheme to defraud. They were merely offers, and only after Provident reviewed these materials and accepted the subscriptions when it sent the letters to the investors, did the scheme become finalized.

Defendants reply upon *Henderson*. In *Henderson*, the defendants represented to various subcontractors that they had obtained a contract with the Philippine government to make physical improvements in the Philippines and that they had the Philippine government's authority to grant subcontracts for the project. The defendants sought and obtained loans of funds from certain subcontractors that were to be used to defray costs in connection with the project and then repaid from the defendants' project proceeds. *Henderson*, 425 F.2d at 136-37. Among other allegations, count three of the indictment charged the defendants with mail fraud arising from the mailing of a cover letter with an executed contract and note to a victim by the lawyer for that victim. *Id.* at 140. The contract and note for the loan of $30,000 were signed by the victim sub-contractor and his

partner on August 18, 1964, and then hand-delivered to an associate of the defendants. *Id.* The victims then hand-delivered cashier's checks to one of the defendants on August 21st and those checks cleared the bank clearing house on August 24th. *Id.* The defendants signed the contract and note and returned both to their associate who in turn hand-delivered them to the attorney for the victim sub-contractor. *Id.* On August 25th, the attorney mailed the cover letter charged in count three, along with the executed copy of the contract and note to his client. *Id.*

The Fifth Circuit reversed the mail fraud conviction related to the mailing alleged in count three. The Fifth Circuit noted, "[a]lthough section 1341 does not require that the material mailed be fraudulent in itself, or be personally received or sent by the appellants, the letter in Count 3 was not mailed in execution of the alleged scheme. Any connection between the letter and appellants' scheme was only incidental or collateral." *Id.* at 142 (internal citations omitted).

Defendants assert that in this case, as in *Henderson*, the mailing of transmittal letters and executed copies of the subscription agreements occurred after the money that was the object of the alleged scheme had been obtained from each investor. As in *Henderson*, the alleged victims had already read and signed the documents that were returned to them along with the transmittal letter. Defendants argue that in this case, as in *Henderson*, the alleged mailings are not in execution of the alleged scheme to defraud, and this Court should dismiss the mail fraud counts.[2]

The Government asserts that *Henderson* is distinguishable. The Government points out that the Fifth Circuit rejected "an automatic rule that a deliberate, planned use of the mails after the victims' money had been obtained can never be 'for the purpose of executing' the defendants'

---

[2] Defendants also assert that because the alleged mailings are not in execution of a scheme to defraud, dismissal of the charge of conspiracy to commit the alleged mailings is also warranted.

7

scheme." *Id.* at 141. The Government argues that the key difference in *Henderson* was that mailing of the contract was not an event planned or foreseen by the defendants. Rather, "[m]ailing the contract to Lewis was entirely the decision of his attorney and was not in any way intended or contemplated by appellants." *Id.* at 142. The Government points out that by contrast, in this case, the Defendants' use of the mails was to address a direct representation that the Defendants had made to their investors in the PPMs: That the investment was made only if Provident accepted the subscription agreement.

In reply, Defendants argue that the Government's assertion that the *Henderson* defendants did not intend or contemplate the mailing by the attorney for the victim only applies to the question of whether the defendants intended to lull the victims into action, a claim that the Government has not made in this case.

The Court agrees with the Government that the facts of *Henderson* are distinguishable from the facts of this case. The question is whether or not the charged mailings were mailed in execution of the alleged scheme. In this case, the Court finds that to be the case. The charged mailings made by Provident were integral to the scheme to defraud, and constituted Provident's binding acceptance of the invested amounts.

## RECOMMENDATION

The Court recommends that the Joint Motion to Dismiss the Superseding Indictment for Failure to Allege Mailings in Furtherance (Dkt. #60) be **DENIED**.

Within fourteen (14) days after service of the magistrate judge's report, any party may serve and file written objections to the findings and recommendations of the magistrate judge. 28 U.S.C. § 636(b)(1)(c).

Failure to file written objections to the proposed findings and recommendations contained in this report within fourteen days after service shall bar an aggrieved party from *de novo* review by the district court of the proposed findings and recommendations and from appellate review of factual findings accepted or adopted by the district court except on grounds of plain error or manifest injustice. *Thomas v. Arn*, 474 U.S. 140, 148 (1985); *Rodriguez v. Bowen*, 857 F.2d 275, 276-77 (5th Cir. 1988).

**SIGNED this 4th day of February, 2013.**

_____
AMOS L. MAZZANT
UNITED STATES MAGISTRATE JUDGE